Concurring opinion filed by Circuit Judge Tatel, with whom Circuit Judges Millett and Pillard join. Concurring opinion filed by Circuit Judge Wilkins, with whom Circuit Judge Rogers joins. Opinion concurring in the judgment filed by Circuit Judge Griffith. Dissenting opinion filed by Circuit Judge Henderson. Dissenting opinion filed by Circuit Judge Kavanaugh, with whom Senior Circuit Judge Randolph joins. Dissenting opinion filed by Senior Circuit Judge Randolph. PILLARD, Circuit Judge: We granted en bane review to consider whether the federal statute providing the Director of the Consumer Financial Protection Bureau (CFPB) with a five-year term in office, subject to removal by the President only for “inefficiency, neglect of duty, or malfeasance in office,” 12 U.S.C. § 5491(c)(3), is consistent with Article II of the Constitution, which vests executive power “in a President of the United States of America” charged to “take Care that the Laws be faithfully executed,” U.S. Const, art. II, § 1, cl. 1; id. § 3. Congress established the independent CFPB to curb fraud and promote transparency in consumer loans, home mortgages, personal credit cards, and retail banking. See 12 U.S.C. § 5481(12). The Supreme Court eighty years ago sustained the constitutionality of the independent Federal Trade Commission, a consumer-protection financial regulator with powers analogous to those of the CFPB. Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). In doing so, the Court approved the very means of independence Congress used here: protection-of agency leadership from at-will removal by the President. The Court has since reaffirmed and built on that precedent, and Congress has embraced and relied on it in designing independent agencies. We follow that precedent here to hold that the parallel provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act shielding the Director of the CFPB from removal without cause is consistent with Article II. Introduction The 2008 financial crisis destabilized the economy and left millions of Americans economically devastated. Congress studied the causes of the recession to craft solutions; it determined that the financial services industry had pushed consumers into unsustainable forms of debt and that federal regulators had failed to prevent mounting risks to the economy, in part because those regulators were overly responsive to the industry they purported to police. Congress saw a need for an agency to help restore public confidence in markets: a regulator attentive to individuals and families. So it established the Consumer Financial Protection Bureau. Congress’s solution was not so much to write new consumer protection laws, but to collect under one roof existing statutes and regulations and to give them a chance to work. Congress determined that, to prevent problems that had handicapped past regulators, the new agency needed a degree of independence. Congress gave the CFPB a single Director protected against removal by the President without cause. That design choice is challenged here as an unconstitutional impediment to the President’s power. To analyze the constitutionality of the CFPB’s independence, we ask two questions; First, is the means of independence permissible? The Supreme Court has long recognized that, as deployed to shield certain agencies, a degree of independence is fully consonant with the Constitution. The means of independence that Congress chose here is wholly ordinary: The Director may be fired only for “inefficiency, neglect of duty, or malfeasance in office,” 12 U.S.C. § 5491(c)(3)—the very same language the Supreme Court approved for the Federal Trade Commission (FTC)back in 1935, Humphrey’s Executor, 295 U.S. at 619, 629-32, 55 S.Ct. 869; see 15 U.S.C. § 41. The CFPB’s for-cause removal requirement thus leaves the President no less removal authority than the provision sustained in Humphrey’s Executor, neither PHH nor dissenters disagree. The mild constraint on removal of the CFPB Director contrasts with the cumbersome or encroaching removal restrictions that the Supreme Court has invalidated as depriving the President of his Article II authority or otherwise upsetting the separation , of powers. In Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 130 S.Ct 3138, 177 L.Ed.2d 706 (2010), the Court left in place ordinary for-cause protection at the Securities and Exchange Commission (SEC)—the same protection that shields the FTC, the CFPB, and other independent agencies-— even as it invalidated an unusually restrictive second layer of for-cause protection of the SEC’s Public Company Accounting Oversight Board (PCAOB) as an interference with Article II. In its only other decisions invalidating removal restrictions, the Supreme Court disapproved of means of independence not at issue here, specifically, Congress’s assigning removal power to itself by requiring the advice and consent of the Senate in Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), and a joint resolution of Congress in Bowsher v. Synar, 478 U.S. 714, 106 S.Ct. 3181, 92. L.Ed.2d 583 (1986). The Supreme Court has never struck down a statute conferring the standard for-cause protection at issue here. Second, does “the nature of the function that Congress vested in” the agency call for that means of independence? Wiener v. United States, 357 U.S. 349, 353, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); see also Morrison v. Olson, 487 U.S. 654, 687, 691 n.30, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). The CFPB is a financial regulator that applies a set of preexisting statutes to financial services marketed “primarily for personal, family, or household purposes.” 12 U.S.C. § 5481(5)(A); see also id. §§ 5481(4), (6), (15). Congress has historically given a modicum of independence to financial regulators like the Federal Reserve, the FTC, and the Office of the Comptroller of the Currency. That independence shields the nation’s economy from manipulation or self-dealing by political incumbents and enables such agencies to pursue the general public interest in the nation’s longer-term economic stability and success, even where doing so might require action that is politically unpopular in the short term. In Humphrey’s Executor, the Supreme Court unanimously sustained the requirement of -cause to remove members of the FTC, a consumer protection agency with a broad mandate to prevent unfair methods of competition in commerce. The FTC, “charged with the enforcement of no policy except the- policy of the law,” Humphrey’s Executor, 295 U.S. at 624, 55 S.Ct. 869; could be independent consistent with the President’s duty to take care that the law be faithfully executed. The CFPB’s focus on the transparency and fairness of financial products geared toward individuals and families 'falls squarely within the types of functions granted independence in precedent and history. Neither PHH nor our dissenting colleagues have suggested otherwise. The ultimate purpose of our constitutional inquiry is to determine whether the means of independence, as deployed at the agency in question, impedes the President’s ability under Article II of the Constitution to “take Care that the Laws be faithfully executed.” U.S. Const, art. II, § 3. It is beyond question that “there are some ‘purely executive’ officials who must be removable by the President at will if he is to be able to accomplish his constitutional role.” Morrison, 487 U.S. at 690, 108 S.Ct. 2597. Nobody would suggest that Congress could make the Secretary- of Defense or Secretary of State, for example, removable only for cause. At the same time, the Court has consistently affirmed the constitutionality of statutes “conferring good-cause tenure on the principal officers of certain independent agencies.” Free Enterprise Fund, 561 U.S. at 493, 130 S.Ct. 3138. The Supreme Court has distinguished those removal restrictions that are compatible with the President’s constitutionally assigned role from those that run afoul of Article II in the line of removal-power cases running from Myers, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160, through Humphrey’s Executor, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611, Wiener, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377, Bowsher, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583, Morrison, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569, and Free Enterprise Fund, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706. The Court has repeatedly held that “a ‘good cause’ removal standard” does not impermissibly burden the President’s Article II powers, where “a degree of independence from the Executive ... is necessary, to the proper functioning of .the agency or official.” Morrison, 487 U.S. at 691 n.30, 686-96, 108 S.Ct. 2597; see Wiener, 357 U.S. at 356, 78 S.Ct. 1275; Humphrey’s Executor, 295 U.S. at 631, 55 S.Ct. 869. Armed with the power to terminate such an “independent” official for cause, the President retains “ample authority to assure”, that the official “is competently performing his or her statutory responsibilities.” Morrison, 487 U.S. at 692, 108 S.Ct. 2597. Petitioners in this case, PHH Corporation, PHH Mortgage Corporation, ;PHH Home Loans, LLC, Atrium Insurance Corporation, and Atrium Reinsurance Corporation (collectively, PHH), would have us cabin the Court’s acceptance of removal restrictions by casting Humphrey’s Executor as a narrow exception to a general prohibition on any removal restriction—an exception it views as permitting the multi-member FTC ■ but not the sole-headed CFPB. The distinction - is constitutionally required, PHH contends, because “multi-member commissions contain their, own internal checks to avoid arbitrary decision-making.” Pet’rs’ Br. 23. PHH’s challenge is not narrow. It claims that independent agencies with - a single leader are constitutionally defective while purporting to spare multi-member ones. But the constitutional distinction PHH proposes between the CFPB’s leadership structure and that of multi-member independent agencies is untenable. That distinction finds no footing in precedent, historical practice, constitutional principle, or the logic of presidential removal power. The relevance of “internal checks” as a substitute for at-will removal by the President is no part of the removal-power doctrine, which focuses on executive control and accountability to the public, not the competing virtues of various internal agency design choices. Congress and the President have historically countenanced sole-headed financial regulatory bodies. And the Supreme Court has upheld Congress’s assignment of even unmistakably executive responsibilities—criminal investigation and prosecution—to a sole officer protected from removal at the President’s will. Morrison, 487 U.S. at 686-96, 108 S.Ct. 2597. Wide margins separate the validity of an independent CFPB from any unconstitutional effort to attenuate presidential control over core executive functions. The threat PHH’s challenge poses to the established validity of other independent agencies, meanwhile, is very real. PHH seeks no mere course correction; its theory, un-cabined by any principled distinction between this case and Supreme Court precedent sustaining independent 'agencies, leads much further afield. Ultimately, PHH makes no secret of its wholesale attack on independent agencies—whether collectively or individually led—that, if accepted, would broadly transform modern government. Because we see no constitutional defect in Congress’s choice to bestow on the CFPB Director protection against removal except for “inefficiency, neglect of duty, or malfeasance in office,” we sustain it. Background The 2008 financial crisis cost millions of Americans their jobs, savings, and homes. The federal commission that Congress and the President chartered to investigate the recession found that, by 2011, “[ajbout four million families have lost their homes to foreclosure and another four and a half million have slipped into the foreclosure process or are seriously behind on their mortgage payments.” Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report, at xv (2011). All told, “[njearly $11 trillion in household wealth has vanished, with retirement accounts and life savings swept away.” Id. In Congress’s view, the 2008 crash represented a failure of consumer protection. The housing bubble “was precipitated by the proliferation of poorly underwritten mortgages with abusive terms,” issued “with little or no regard for a borrower’s understanding of the terms of, or their ability to repay, the loans.” S. Rep. No. 111-176, at 11-12 (2010). Federal bank regulators had given short shrift to consumer protection as they focused (unsuccessfully) on the “safety and soundness” of the financial system and, post-crisis, on the survival of the biggest financial firms. Id. at 10. Congress concluded that this “failure by the prudential regulators to give sufficient consideration to consumer protection ... helped bring the financial system down.” Id. at 166. Congress responded to the crisis by including in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010), a new regulator: the Consumer Financial Protection Bureau. Congress gave the new agency a focused mandate to improve transparency and competitiveness- in the market for consumer financial products, consolidating authorities to protect household finance that had been previously scattered among separate agencies in order to end the “fragmentation of the current system” and “thereby ensur[e] accountability.” S. Rep. No. 111-176, at 11. The CFPB administers eighteen preexisting, familiar consumer-protection laws previously overseen by the Federal Reserve and six other federal agencies, virtually all of which were also independent. These laws seek to curb fraud and deceit and to promote' transparency and best practices in consumer loans, home mortgages, personal credit cards, and retail banking. See 12 U.S.C. § 5481(12). The CFPB is charged “to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services” that “are fair, transparent, and competitive.” Id. § 5511(a). Additionally, the CFPB has authority to prohibit any “unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.” Id. § 5531(a). To lead this new agency, Congress provided for a single Director to be appointed by the President and confirmed by the Senate. Id. §§ 5491(b)(l)-(2). Congress designed an agency with a single Director, rather than a multi-member body, to imbue the agency with the requisite initiative and decisiveness to do the job of monitoring and restraining abusive or excessively risky practices in the fast-changing world of consumer finance. See, e.g., S. Rep. No. 111-176, at 11. A single Director would also help the new agency become operational promptly, as it might have taken many years to confirm a full quorum of a multi-member body. See 155 Cong. Rec. 30,826-27 (Dec. 9, 2009) (statement of Rep. Wax-man) (noting that a single director “can take early leadership in establishing the agency and getting it off the ground”). The Director serves a five-year term, with the potential of a holdover period pending confirmation of a successor.[1] 12 U.S.C. §§ 5491(c)(l)-(2). ■ The President may remove the Director “for inefficiency, neglect of duty, or malfeasance in office,” ie., for cause. Id. § 5491(c)(3). By providing the Director with a fixed term and for-cause protection, Congress sought to promote stability and confidence in the country’s financial system. Congress also determined “that the assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator.” S. Rep. No. 111-176, at 163. Congress has provided similar independence to other financial regulators, like the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the National Credit Union Administration, and the Federal Housing Finance Agency, which all have complete, uncapped budgetary autonomy. See infra Part I.C.2. Congress authorized the CFPB to draw from á statutorily capped pool of funds in the Federal Reserve System rather than to charge industry fees or seek annual appropriations from Congress as do some other regulators. The Federal Reserve is required to transfer “the amount determined by the Director [of the CFPB] to be reasonably necessary to carry out the authorities of the Bureau,” up to twelve percent of the Federal Reserve’s total operating expenses. 12 U.S.C. §§ 5497(a)(l)-(2). If the Bureau requires funds beyond that capped allotment, it must seek them through congressional appropriation. Id. § 5497(e). The Real Estate Settlement Procedures Act of 1974 (RESPA) is one of the eighteen .preexisting statutes the CFPB now administers. See 12 U.S.C. §§ 2601-2617. RESPA aims at, among other things, “the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain [real estate] settlement services.” Id. § 2601(b)(2). To that end, RESPA’s Section 8(a) prohibits giving or accepting “any fee, kickback, or thing of value pursuant to any agreement or understanding” to refer business involving a “real estate settlement service.” Id. § 2607(a). The term “thing of value” is “broadly defined” and includes “the opportunity to participate in a money-making program.” 12 C.F.R. § 1024.14(d). Another provision of RESPA, Section 8(c)(2), states that “[n]othing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for-goods or facilities actually furnished or for services actually performed.” 12 U.S.C. § 2607(c), In this case, the CFPB Director interpreted those provisions of RESPA as applied to PHH’s mortgage insurance and reinsurance transactions. Mortgage insurance protects lenders in the event a borrower defaults on ’ a mortgage loan. Mortgage lenders often require riskier borrowers to purchase such insurance as a condition of approving a loan. See Director’s Decision at 3. In turn, insurers may obtain reinsurance, transferring to the reinsurer some of their risk of loss in exchange for a portion of the borrower’s monthly insurance premiums. Borrowers do not ordinarily shop for mortgage insurance, let alone reinsurance; rather, they are referred to insurers of the lender’s choosing, to whom they then pay monthly premiums. See id. During the period at issue, the only mortgage reinsurers in the market were “captive”—that is, they existed to reinsure loans originated by the mortgage lenders that owned them. See id. at 13; In a captive'reinsurance arrangement, a mortgage lender refers borrowers to a mortgage insurer, which then pays a kickback to the lender by using the lender’s captive reinsurer. On January 29, 2014, the CFPB filed a Notice of Charges against PHH, a large mortgage lender, and its captive reinsurer, Atrium. The CFPB alleged that “[t]he premiums ceded , by [mortgage insurers] to PHH through Atrium: (a) were not for services actually furnished' or performed, or (b) grossly exceeded the value of any such services,” and that the premiums were instead “made in consideration of PHH’s continued referral of mortgage insurance business.” Notice of Charges, at 17-18. The CFPB borrowed an administrative law judge (ALJ) from the Securities and Exchange Commission (SEC) to adjudicate the charges. The ALJ issued a Recommended Decision concluding that PHH and Atrium violated RESPA because they had not demonstrated that the reinsurance premiums Atrium collected from insurers were reasonably related to the value of its reinsurance services. The ALJ recommended that the Director order disgorgement of about $6.4 million. Director’s Decision at 9. On review of the ALJ’s recommendation, the CFPB Director read RESPA to support a broader finding of misconduct and a substantially larger remedy. The Director held that a payment is “bona fide” and thus permitted under Section 8(c)(2)- only if it is “solely for the service actually being provided on its own merits,” and not “tied in any way to a referral of business.” Director’s Decision at 17. Thus, even if the reinsurance premiums had been reasonably related to the value of the rein-suranee services that Atrium provided, PHH and Atrium could still be liable under the Director’s reading of RESPA insofar as their tying arrangement funneled valuable business to Atrium that it. would not have garnered through open competition. The Director also held that RESPA’s three-year statute of limitations does not apply to the agency’s administrative enforcement proceedings (only to “actions” in court) and that RESPA violations accrue not at the moment a loan closes with a tying arrangement in place, but each time monthly premiums are paid out pursuant to such a loan agreement. Id. at 11, 22. Those interpretations raised the disgorgement amount to more than $109 million. This court stayed the Director’s order pending review. In October 2016, a three-judge panel vacated the Director’s decision and remanded for further proceedings. 839 •F.3d 1, 10 (D.C. Cir. 2016). A divided panel’s majority held that providing for-cause protection to the sole director of an independent agency violates the Constitution’s separation of powers. Severing the for-cause provision from the rest of the Dodd-Frank Act, the majority effectively turned the CFPB into an instrumentality of the President with a Director removable at will. See id. at 12-39. The panel was unanimous, however, in overturning the Director’s interpretation of RESPA. It held that Section 8 permits captive reinsurance arrangements so long as mortgage insurers pay no more than reasonable market value for reinsurance. See 839 F.3d at 41-44. And, even, if the Director’s contrary -interpretation (that RESPA prohibits tying arrangements) were permissible, the panel held, it was an unlawfully retroactive reversal of the federal government’s prior position. See id. at 44-49. Finally, according to the panel, a three-year statute of limitations applies to both administrative proceedings and civil actions enforcing’ RESPA. See id. at 50-55. Judge Henderson joined the panel’s opinion on the statutory' questions but dissented from its constitutional holding on the ground that it was unnecessary in her view, and so inappropriate under the doctrine of avoidance, to reach the constitutional removal-power' question. Id. at 56-60. The en banc court vacated the panel decision in its entirety. Following oral argument, the full court, including Judge Henderson, unanimously concluded that we cannot avoid the constitutional question. . That is because the. disposition. of PHH’s claims, reinstating the panel’s statutory holding, results,in a remand to the CFPB. Further action by the CFPB necessitates a decision on the constitutionality of the Director’s for-cause removal protection. We accordingly decide only that constitutional question. The panel opinion, insofar as it related to the interpretation of RESPA and its application to PHH and Atrium in. this case, is accordingly reinstated as the decision of the three-judge panel on those questions. We also decline to reach the separate question whether the ALJ who initially considered this case was appointed consistently with .the Appointments Clause. Our order granting review invited the parties to address the Appointments Clause implications.for thiS’Case only.“[i]f the en banc court” in Lucia v. SEC, 832 F.3d 277 (D.C. Cir. 2016), concluded that an SEC ALJ is an inferior officer rather than an employee. We did not so conclude. Instead, after argument in that case, the en banc, court denied the petition for review. Lucia v. SEC, 868 F.3d 1021 (D.C. Cir. 2017), cert. granted, 2018 WL 386565, — U.S. —, 138 S.Ct. 736, 199 L.Ed.2d 602 (Jan, 12, 2018). Today, we hold that federal law providing the Director of the CFPB with a five-year term in office, subject to removal by the President only for “inefficiency, neglect of duty, or malfeasance in office,” is consistent with the President’s constitutional authority. Analysis PHH challenges the removal protection of the Consumer Financial Protection Bureau’s Director, arguing that it unconstitutionally upsets the separation of powers. But the CFPB’s structure respects the powers and limits of each branch of government. Congress’s decision to establish an agency led by a Director removable only for cause is a valid exercise of its Article I legislative power. The for-cause removal restriction fully comports with the President’s Article II executive authority and duty to take care that the consumer financial protection laws within the CFPB’s purview be faithfully executed. The panel’s grant of PHH’s due process claim illustrates how the exercise of legislative and executive powers to establish and empower the CFPB are backstopped by the Article III courts’ obligation to protect individual liberty when government overreaches. Our analysis focuses on whether Congress’s choice to include a for-cause removal provision impedes the President’s ability to fulfill his constitutional role. Two principal considerations inform our conclusion that it does not. First, the familiar for-cause protection at issue broadly allows the President to remove the Director for “inefficiency, neglect of duty, or malfeasance in office,” leaving the President ample tools to ensure the faithful execution of the laws. Second, the functions of the CFPB and its Director are not core executive functions, such as those entrusted to a Secretary of State or other Cabinet officer who we assume must directly answer to the President’s will. Rather, the CFPB is one of a number of federal financial regulators—including the Federal Trade Commission, the Federal Reserve, the Federal Deposit Insurance Corporation, and others—that have long been permissibly afforded a degree of independence. The CFPB matches what the Supreme Court’s removal-power cases have consistently approved. Accepting PHH’s claim to the contrary would put the historically established independence of financial regulators and numerous other independent agencies at risk. None of the theories advanced by PHH supports its claim that the CFPB is different in kind from the other independent agencies and, in particular, traditional independent financial regulators. The CFPB’s authority is not of such character that removal protection of its Director necessarily interferes with the President’s Article II duty or prerogative. The CFPB is neither distinctive nor novel in any respect that calls its constitutionality into question. Because none of PHH’s challenges is grounded in constitutional precedent or principle, we uphold the agency’s structure. I. Precedent and History Establish the Constitutionality of the CFPB The Constitution makes no explicit provision for presidential removal of duly appointed officers, but the Supreme Court has long recognized that “the executive power include[s] a power to oversee executive officers through removal.” Free Enterprise Fund, 561 U.S. at 492, 130 S.Ct. 3138. The Court has found the removal power implied in aid of the executive power, which the Constitution vests “in a President of the United States of America” charged to “take Care that the Laws be faithfully executed.” U.S. Const, art. II, § 1, cl. 1; id. § 3. The Court’s decisions, from Myers to Free Enterprise Fund, also acknowledge the legitimacy, in appropriate circumstances, of an agency’s independence from the President’s removal of its leadership without cause. And history teaches that financial regulators are exemplars of appropriate and necessary independence. Congress’s decision to afford removal protection to the CFPB Director puts the agency squarely within the bounds of that precedent and history, fully consonant with the Constitution. A. Precedent The Court has consistently upheld ordinary for-cause removal restrictions like the one at issue here, while invalidating only provisions that either give Congress some role in the removal decision or otherwise make it abnormally difficult for the President to oversee an executive officer. In the first modern removal-power decision, Myers v. United States, the Court held that Congress could not condition presidential removal of certain postmasters on the Senate’s advice and consent, explaining that the President has “the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate.” 272 U.S. at 106, 47 S.Ct. 21. Without interpreting the Take Care Clause as such, see Jack Goldsmith & John F. Manning, The Protean Take Care Clause, 164 U. Penn. L. Rev. 1836,1840-41 (2016), the Court in Myers appeared to assume the Clause dictated illimitable removal power in the President. PHH deploys that conception of illimitable removal power against the CFPB. But the Supreme Court since Myers has cabined that decision’s apparent reach, recognizing the constitutionality of some measure of independence for agencies with certain kinds of functions. The Court in Morrison, Wiener, and Humphrey’s Executor explicitly and repeatedly upheld for-cause removal restrictions in a range of contexts where the Constitution tolerates a degree of independence from presidential control. The Court’s latest removal-power decision, Free Enterprise Fund, applied the same analysis developed in those cases to strike an especially onerous set of removal restraints. The Court held that those double-layered restrictions, taken together, interfered with the President’s oversight of faithful execution of the securities laws, but it left in place the SEC Commissioners’ ordinary for-cause protection—the same protection at issue here. The Court’s removal-power doctrine supports Congress’s application of a modest removal restriction to the CFPB, a financial regulator akin to the independent FTC in Humphrey’s Executor and the independent SEC in Free Enterprise Fund, with a sole head like the office of independent counsel in Morrison. It was only nine years after Myers, in Humphrey’s Executor, that the Court unanimously upheld a provision of the Federal Trade Commission Act protecting FTC Commissioners from removal except for “inefficiency, neglect of duty, or malfeasance in office.” 295 U.S. at 619, 632, 65 S.Ct. 869. Humphrey’s Executor explained that Myers was limited; it required only that the President be able to remove purely executive officers without congressional involvement. Id. at 628, 55 S.Ct. 869. By contrast, where administrators of “quasi legislative or quasi judicial agencies” are concerned, the Constitution does not require that the President have “illimitable power” of removal. Id. at 629, 55 S.Ct. 869. The Humphrey’s Executor Court drew guidance from the founding era, when James Madison (otherwise a strong proponent of the removal power) argued that an official who “partakes strongly of the judicial character . should not hold ... office at the pleasure of the Executive branch of the Government.” 5 The Writings of James Madison 413 (Hunt ed;, 1904); see Humphrey’s Executor, 295 U.S. at 631, 55 S.Ct. 869. Because Congress may require quasi-legislative and quasi-judicial administrators “to act in discharge of them duties independently of executive control,” it may “forbid their removal except for cause” during a fixed term in office. Id. at 629, 55 S.Ct. 869. A generation later, an again-unanimous Court in Wiener v. United States, 357 U.S. at 352-55, 78 S.Ct. 1275, per Justice Frankfurter, explicitly reaffirmed Humphrey’s Executor and held that neither the rationale supporting the President’s re- • moval power nor the history of that power dating back to the First Congress required ■ that the President always enjoy unconstrained authority to remove leadership of every kind of agency at his will. Wiener concerned the War Claims Commission, which had been set up to compensate certain personal injuries and property losses at the hands of the enemy in World War II, Both President Eisenhower (in Wiener) and President Roosevelt (in Humphrey’s Executor) wanted the leaders of the respective agencies “to be their men,” removable at will, but in each case Congress had opted for and the Court sustained a modicum of independence. Id. at 354, 78 S.Ct. 1275, In Wiener, Justice Frankfurter expressly took hito account the “thick chapter” of “political-and judicial history” of controversy over the President’s removal power that the Court had canvassed at length in Myers. 357 U.S. at 351, 78 S.Ct. 1275. The Wiener Court rejected President Eisenhower’s broad, categorical understanding of Myers as largely drawn from its dictum and—-in light of Humphrey’s Executor— appropriately “short-lived.” Id. at 352, 78 S.Ct. 1275. Commenting that “the versatility of circumstances' often mocks a natural desire for defínitiveness,” id., Wiener squarely denied that the President had a power of removal that Congress could not limit under any circumstance, “no matter the relation of the executive to the discharge of [the official’s] duties and no matter what restrictions Congress may have imposed regarding the nature of them tenure.” Id. Rather, with attention to the sort of agency involved, Humphrey’s. Executor had “narrowly confined the scope of the Myers decision” to purely executive officers, not members of quasi-judicial bodies. Id. The Wiener Court identified “the.most reliable factor” in deciding whether a removal restriction comported with the President’s constitutional authority to be “the nature of the function that Congress vested” in the agency. Id. at 353, 78 S.Ct. 1275; see Humphrey’s Executor, 295 U.S. at 631, 55 S.Ct. 869 (“Whether the power of the President to. .remove an officer shall prevail,] ... precluding a removal except for cause will depend upon the character of the office ....”). The Court distinguished core executive agents who must be fully responsive to the President’s preferences from those whose tasks call for a degree of independence “from Executive interference.” Wiener, 357 U.S. at 353, 78 S.Ct. 1275. What mattered in Wiener was the “intrinsic judicial character of the task with which the [War Crimes] Commission was charged”: Congress had directed the Commission to “‘adjudicate according to law’ the classes of claims defined in the statute” entirely on their merits, free of personal or partisan pressures. Id. at 355, 78 S.Ct. 1275. That directive prevented the President from interfering at will with the leadership of the Commission. The legislation establishing the Commission made plain, even in the absence of an express for-cause removal provision, that “Congress did not wish to have hang over the Commission the Damocles’ sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.” Id. at 356, 78 S.Ct. 1275. Though the Court in Humphrey’s Executor and Wiener thus emphasized the “quasi-legislative” and “quasi-judicial” character of the relevant offices, more recently the Court in Morrison v. Olson downplayed those particular characterizations of independent agencies- while continuing to narrowly .read Myers. as disapproving “an attempt by Congress itself to gain a role in the removal of executive officials other than its established powers of impeachment and conviction.” 487 U.S. at 686, 108 S.Ct. 2597. Morrison posed more directly the question whether a removal restriction “interfere[d] with- the President’s exercise of the ‘executive power’ and his constitutionally appointed duty to ‘take cafe that the laws be faithfully executed’ under Article II.” Id. at 690, 108 S.Ct. 2597. According to Morrison, the references in the earlier removal-power cases to the “character” of- the relevant offices could best be understood as describing “the circumstances in which Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a ‘good cause’ removal standard, is necessary to the proper functioning of the agency or official” in fulfilling its duties. Id. at 691 n.30, 108 S,Ct. 2597. The Court explained that its decision in Humphrey’s Executor to sustain the independence that Congress thought appropriate for the FTC, with its “ ‘quasi-legislative’. or ‘quasi-judicial’ ” character, reflected the Court’s “judgment that it was not essential to the President’s proper execution of his Article II powers that [the FTC] be headed up by individuals who were removable at will.” Morrison, 487 U.S. at 690-91, 108 S.Ct. 2597. Morrison viewed as constitutionally relevant Congress’s determination that the role and character of a special independent prosecutor called for' some autonomy from the President. Echoing Wiener, the Court in Morrison hgain rejected as “dicta” the “implication” drawn from Myers that the President’s removal power should in every circumstance be understood as “all-inclusive.” Id. at 687, 108 S.Ct. 2597. Instead, Morrison read Humphrey’s Executor and its progeny to allow Congress to provide limited removal protection for some administrative bodies, whose- leadership Congress “intended to perform their duties ‘without executive leave and ... free from executive control.’ ” Id. n.25 (alteration in original) (quoting Humphrey’s Executor, 295 U.S. at 628, 55 S.Ct. 869). The Morrison Court evaluated the independent counsel’s for-cause protection accordingly. The independent counsel concededly performed functions that were traditionally “executive,” but Morrison pinpointed “the real question” as ‘-“whether the removal restrictions are of such a nature that they impede the President’s ability.to perform his constitutional duty.” Id', at 691, 108 S.Ct. 2597. Analyzing “the functions of the officials in question ... in that light,” id., -the'Court found the removal protection to be constitutional, recognizing it as “essential, in the view of Congress, to- establish the necessary independence of the office.” Id. at 693,108 S.Ct. 2597. To be sure, the office of independent counsel was potent: It was empowered to prosecute high-ranking federal officials for- violations of federal criminal law. Nevertheless, its removal protection did not-unconstitutionally impinge ‘ on executive power. The Court “simply [did] not see how the President’s need to control the exercise of [the independent counsel’s] discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.” Id. at 691-92, 108 S.Ct. 2597. The Court noted that the President retained “ample authority” to review the independent counsel’s performance and that, because the independent counsel was removable by the Attorney General for good cause,.the President’s removal power had not been “completely stripped.” Id. at 692,108 S.Ct. 2597. The Supreme Court has thus recognized that Congress may value and deploy a degree of independence on the part of certain executive officials. At least so long as Congress does not disturb the constitutional balance by arrogating to itself a role in removing the relevant executive officials, see Bowsher, 478 U.S. at 726, 106 S.Ct. 3181; Myers, 272 U.S. at 161, 47 S.Ct. 21, the Constitution admits of modest removal constraints where “the character of the office” supports making it somewhat “free of executive or political control,” Morrison, 487 U.S. at 687, 691 n.30, 108 S.Ct. 2597. The Court has sustained Congress’s determinations that removal restrictions were appropriate to protect the independence of heads of agencies devoted specifically to special prosecution in Morrison, claims adjudication in Wiener, and market competition and consumer protection in Humphrey’s Executor. Without questioning that there are certain agencies that Congress cannot make even modestly independent of the President, the Court accepted the removal restriction in each of those three cases as appropriate protection against the “ ‘coercive influence’ of the [at-will] removal power” that otherwise “would ‘threaten the independence of the [agency].’ ” Morrison, 487 U.S. at 690, 688, 108 S.Ct. 2597; see Wiener, 357 U.S. at 356, 78 S.Ct. 1275; Humphrey’s Executor, 295 U.S. at 629-30, 55 S.Ct. 869. Invalidating a provision shifting removal power over the Comptroller General from the President to Congress, the Supreme Court in Bowsher v. Synar again insisted on a narrow reading of Myers—at odds with the reading PHH advances here. The Supreme Court treated Myers as holding only “that congressional participation in the removal of executive officers is unconstitutional.” 478 U.S. at 725, 106 S.Ct. 3181. To have an executive officer “answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws” in violation of the constitutional separation of powers. Id. at 726, 106 S.Ct. 3181. Setting aside the removal scheme before it, the Court in Bowsher made clear that Humphrey’s Executor and its progeny “involved an issue not presented either in the Myers case or in this case”—i.e., the constitutional validity of a statute leaving the removal power under the President’s control, but authorizing its exercise “only ‘for inefficiency, neglect of duty, or malfeasance in office.’ ” Id. at 724-25, 106 S.Ct. 3181 (quoting Humphrey’s Executor, 295 U.S. at 628-29, 55 S.Ct. 869). Bowsher thus acknowledged the constitutionality of for-cause limitation on the removal power when the President retains the power to find cause. The culprit violating the separation of powers in Bowsher was Congress’s aggrandizement of its own control over executive officers. The Supreme Court’s most recent removal-power decision, Free Enterprise Fund, invalidated a “highly unusual” removal restriction because it interfered with the President’s ability to “remove an officer ... even if the President determines that the officer is neglecting his duties or discharging them improperly.” 561 U.S. at 484, 505, 130 S.Ct. 3138. The problem was not congressional encroachment, but damage to the President’s ability to supervise executive officers: “ ‘Even when a branch does not arrogate power to itself,’ ... it must not ‘impair another in the performance of its constitutional duties.’” Id. at 500, 130 S.Ct. 3138 (quoting Loving v. United States, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996)). “The President cannot ‘take Care that the Laws be faithfully executed’ if he cannot oversee the faithfulness of the officers who execute them.” 561 U.S. at 484, 130 S.Ct. 3138. Free Enterprise Fund distinguishes ordinary for-cause requirements from abnormally constraining restrictions that impair .the President’s constitutional oversight prerogative. At issue in Free Enterprise Fund was an extreme variation on the traditional good-cause removal standard: a provision of the Sarbanes-Oxley Act that afforded members of the Public Company Accounting Oversight Board, an agency within the Securities and Exchange Commission, unusually strong protection from removal. See 561 U.S. at 486, 130 S.Ct. 3138. As in Morrison, the Court focused its inquiry on whether the President retains “power to oversee executive officers through removal.” Id. at 492, 130 S.Ct. 3138. The challenged provisions shielded the PCAOB with “two layers of for-cause [protection from] removal—including at one level a sharply circumscribed definition of what constitutes ‘good cause,’ and rigorous procedures that must be followed prior to removal.” Id. at 505, 130 S.Ct. 3138. It provided that PCAOB members could be removed only by a formal order of the SEC, and only “for good cause shown.” Id. at 486-87, 505, 130 S.Ct. 3138. But this was no garden-variety cause standard: It required a pre-removal finding, “on the record” and “after notice and opportunity for a hearing,” of a Board member’s willful violation of the Sarbanes-Oxley Act itself, the PCAOB’s own rules, or the securities laws, or willful abuse of Board member authority, or a lack of “reasonable justification or excuse” for failure to enforce compliance. Id. at 486, 130 S.Ct. 3138; 15 U.S.C. § 7217(d)(3). On top of that, the SEC’s Commissioners—tasked with removing such delinquent Board members— were themselves protected from presidential removal except for inefficiency, neglect of duty, or malfeasance in office. Free Enterprise Fund, 561 U.S. at 487, 130 S.Ct. 3138. The scheme challenged in Free Enterprise Fund was defective because the Court found that it “withdraws from the President any decision on whether good cause exists” and thus “impair[s]” the President’s “ability to execute the laws— by holding his subordinates accountable for their conduct.” Id. at 495-96, 130 S.Ct. 3138. The Court distinguished Humphrey’s Executor and Morrison as involving “only one level of protected tenure separat[ing] the President from an officer exercising executive power.” Id. at 495, 130 S.Ct. 3138. When Congress provides agency heads with for-cause protection against removal by the President, the Court held, it must define “cause” in such a way as to leave the President leeway to sufficiently “oversee” these heads to prevent misconduct. Id. at 492-93, 130 S.Ct. 3138. The problem with the PCAOB’s protection, then, was that the President did not retain that oversight. Specifically, “multilevel” for-cause protection rendered the President unable to “remove an officer ... even if the President determines that the officer is neglecting his duties or discharging them improperly.” Id. at 484, 130 S.Ct. 3138. The Court’s solution to that problem was to retain one level of for-cause protection and remove the other. Id. at 514, 130 S.Ct. 3138. Thus, the Board members who serve under the SEC Commissioners may be removed by the Commissioners without cause, but the SEC Commissioners’ for-cause protection remains in place. The traditional for-cause protection enjoyed by the SEC Commissioners—and the officials in Morrison, Wiener, and Humphrey’s Executor—remains .• untouched by and constitutionally valid under Free Enterprise Fund. When an official is so protected, the President may not remove her or him for personal or partisan reasons, or for no reason at all. But, because such a cause requirement does not prevent removal by reason of incompetence, neglect of duty, or malfeasance, it may apply without impairing the President’s ability to assure the faithful execution of the law. See Morrison, 487 U.S. at 691-92, 108 S.Ct. 2597; Free Enterprise Fund., 561 U.S. at 495-96, 130 S.Ct. 3138. Free Enterprise Fund did not, contrary to PHH’s suggestion, narrow Humphrey’s Executor■ or give Myers newly expansive force. See Pet’rs’ Br. 21-22 & n.4.- The Court’s “modest” point was “not to take issue with for-cause limitations in general,” but rather that the unprecedented restriction on the President’s ability to remove a member of the PCAOB hobbled his power to oversee executive officers. 561 U.S. at ,501, 130 S.Ct.,3138. As the Supreme Court had already made clear, “the only issue actually decided in Myers was that ‘the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress.’ ” Morrison, 487 U.S. at 687 n.24, 108 S.Ct. 2597 (quoting Humphrey’s Executor, 295 U.S. at 626, 55 S.Ct. 869); see Wiener, 357 U.S. at 351-52, 78 S.Ct. 1275. Free Enterprise Fund, for its part, cites Myers only for general restatements- of law, all of which are consistent with Morrison, Wiener, and Humphrey’s Executor. The opinion emphasizes, for example, that “[sjinee 1789, the Constitution has been understood to empower the- President to keep [executive] officers accountable—-by removing them from office, if necessary,” and quotes Myers for the accepted principle that “the President .. must have some ‘power of removing thosé for whom he can not continue to be responsible.’” Free Enterprise Fund, 561 U.S. at 483, 493, 130 S.Ct. 3138 (quoting Myers, 272 U.S. at 117, 47 S.Ct. 21). At the same time, Free Enterprise Fund recognizes the functional' values of those for-cause protections the Court has sustained as consistent with the President’s Take Care duty: An FTC “ ‘independent in- character,’ [and] ‘free from political domination or control,’” in Humphrey’s Executor, “the necessary independence of the office” of the independent counsel in Morrison; and “the rectitude” of officers administering a. fund to compensate for war losses in Wiener. Free Enterprise Fund, 561 U.S. at 502, 130 S.Ct. 3138 (quoting Humphrey’s Executor, 295 U.S. at 619, 55 S.Ct. 869; Morrison, 487 U.S. at 693, 108 S.Ct. 2597; Wiener, 357 U.S. at 356, 78 S.Ct. 1275). Thus, the Court has upheld statutes that, like the challenged provision of the Dodd-Frank Act, “confer[] good7cause tenure on the principal officers of certain independent agencies.” Free Enterprise Fund, 561 U.S. at 493, 130 S.Ct. 3138. Decisions from Humphrey’s Executor to Free Enterprise Fund have approved standard for-cause removal restrictions where Congress deems them necessary for the effectiveness of certain types of agencies, provided that the President remains able to remove the agency heads for acting inefficiently, without good faith, or for neglecting their duties. The “real question” to ask, in .considering such a statute, “is whether the removal restrictions- are of such a nature that they impede the President’s ability to perform his constitutional duty/’, taking account of the “functions of the officials in question.” Morrison, 487 U.S. at 691, 108 S.Ct. 2597; The question for us, then, is whether the requirement that the President have cause before removing a Director of the CFPB unconstitutionally interferes with the President’s Article II powers. • B. History “The subject [of the President’s removal authority] was not discussed in the Constitutional Convention.” Myers, 272 U.S. at 109-10, 47 S.Ct. 21 (1926). But there was a diversity of opinion on the subject at the founding, and early examples of heterogeneity in agency design bear that out. Financial regulation, in particular, has long been thought to be well served by a degree of independence. Congressional alertness to the distinctive danger of political interference with financial affairs, dating to the founding era, began the longstanding tradition of affording some independence to the government’s financial functions. See Amicus Br. of Separation of Powers Scholars 4-10. Whereas the secretaries of the two other original departments (War and Foreign Affairs) were broadly chartered to “perform and execute such duties ás shall from time to time be enjoined on or intrusted to [them] by the President of the United States,” Act of July 27, 1789, ch. 4, § 1, 1 Stat. 28, 29; Act of Aug. 7,1789, ch. 7, § 1, 1 Stat. 49, 50, Congress specified the responsibilities of the Treasury Secretary and other officers in the Treasury Department in some detail, see Act of Sept. 2, 1789, ch. 12, §§ 2-6, 1 Stat. 65, 65-67. See Gerhard Casper, An Essay in Separation of Powers: Some Early Versions and Practices, 30 Wm. & Mary L. Rev. 211, 241 (1989) (noting that, under the statutes of 1789 establishing the three “great departments” of government, “[o]nly the departments of State and War were completely ‘executive’ in nature”). The Comptroller of the Treasury, notably, was charged with “directing] prosecutions for all delinquencies of officers of the revenue; and for debts that are, or 'shall be due to the United States,” id. at § 3, 1 Stat. at 66, and his decisions were deemed “final and conclusive,” Act of Mar. 3, 1795, § 4, 1 Stat. 443, 443. ,He could be removed if found to “offend against any of the prohibitions of this act.” 1 Stat. at 67. It is unclear whether the Comptroller was also thought to be removable by the President for other reasons, but James Madison, who was generally opposed to remoyal protections, said he believed “there may be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive branch of the Government,” 1 Annals of Cong. 612 (1789), The nature of the Comptroller’s office and independence eventually changed, but it is evident that the Comptroller was, from inception, meant to exercise an unusual degree of independent judgment. See Lawrence Les-sig, Readings by Owr Unita/ry Executive, 15 Cardozo L. Rev. 175, 184 (1993) (explaining that the President had “no directory control over the Comptroller General” and'that'“the Fraihers and the early congresses treated this independence as flowing from the ’nature of the Comptroller’s duties”); Charles Tiefer, The Constitutionality of Independent Officers as Checks on Abuses of Executive Power, 63 B.U. L, Rev. 59, 73-75 (1983) (explaining that the Comptroller was “clearly ,.. expected to exercise independent judgment”). At the dawn of the modern-day federal banking system, Congress continued to afford some independence to financial regulators as it set up the Office of the Comptroller of the Currency. See Nat’l Bank Act of 1863, 12 Stat. 665, 665-66 (1863); Nat’l Bank Act of 1864, 13 Stat. 99 (1864). Since the office’s inception, the Comptroller of the Currency has been removable only if the President sends the Senate “reasons” for removing him. 12 U.S.C. § 2. Whatever the type of reason it requires, the statute without question constrains the presidential removal power. The U.S. Code accordingly classifies the Comptroller of the Currency as an “independent regulatory agency” along with all the other removal-constrained independent agencies. 44 U.S.C. § 3502(5); see also 12 U.S.C. § 1(b)(1) (prohibiting the Treasury Secretary from interfering with the Comptroller); 2 Op. O.L.C. 129 (1978) (concluding that the Comptroller has independent litigation authority). The independence of financial regulators remains a prominent pattern today. The Federal Reserve Board is led by governors who can be removed only for cause during their fourteen-year terms. 12 U.S.C. § 242. The reason is simple: The Federal Reserve must “provide for the sound, effective, and uninterrupted operation of the banking system,’’ and Congress found that a degree of independence was needed to “increase the ability of the banking system to promote stability.” H.R. Rep. No. 74-742, at 1 (1935). By insulating the Board from presidential control and political pressures, Congress sought to ensure that the Federal Reserve would “reflect, not the opinion of a majority of special interests, but rather the well considered judgment of a body that takes into consideration all phases of national economic life.” ■Id. at 6. The Federal Trade Commission stands as another example of an independent financial regulator in the modern era—one expressly approved by the Supreme Court. When the FTC was created, the Senate Committee Report described the need for independence as ensuring “a continuous policy ... free from the effect of ... changing incumbency” in the White House. 51 Cong. Rec. 10,376 (1914). Congress reasoned that, as the country passed “through a depression,” a new consumer protection agency with a degree of independence would “give reassurance rather than create doubt.” Id.; see also id. (“The powers [of the FTC] must be large, but the exercise of the powers will not be against honest business, but will be persuasive and correctional ....”). In Humphrey’s Executor, the Supreme Court expressly approved of Congress’s choice to insulate this new consumer protection agency via a for-cause removal provision. 295 U.S. at 619, 632, 55 S.Ct. 869. These examples typify other federal financial regulators, such as the Commodity Futures Trading Commission, the Federal Deposit Insurance Corporation, the Federal Housing Finance Authority, the National Credit Union Administration, and the Securities and Exchange Commission, which are considered independent whether or not for-cause removal protection is specified by statute. See Henry B. Hogue et al., Cong. Research Serv., R43391, Independence of Federal Financial Regulators: Structure, Funding, and Other Issues 1, 15 (2017)., This makes sense because Congress has consistently deemed “[ijnsulation from political concerns” to be “advantageous in cases where it is desirable for agencies to make decisions that are unpopular in the short run but beneficial in the long run,” such as, for example, “the Fed’s monetary policy decisions.” Id. at 5 n.16. History and tadition, as well as precedent, show that Congress may appropriately give some limited independence to certain financial regulators. C. Application to the CFPB The for-cause protection shielding the CFPB’s sole Director is fully compatible with the President’s constitutional authority- Congress validly decided that the CFPB needed a measure of independence and chose a constitutionally acceptable means to protect it. First, the removal restriction here is wholly ordinary—the verbatim pro-, tection approved by the Supreme Court back in 1935 in Humphrey’s Executor and reaffirmed ever since. The provision here neither adds layers of protection nor arrogates to Congress any role in removing an errant official. Second, the CFPB Director’s autonomy is consistent with a longstanding tradition of independence for financial regulators, and squarely supported by established precedent. The CFPB’s budgetary independence, too, is traditional among financial regulators, including in combination with typical removal constraints. PHH’s constitutional challenge flies in the face of the Supreme Court’s removal-power cases, and calls into question the structure of a host of independent agencies that make up the fabric of the administrative state. There is nothing constitutionally' suspect about the CFPB’s leadership structure. Morrison and Humphrey’s Executor stand in the way of any holding to the contrary. And there is no reason to assume an agency headed by an individual will be less responsive to presidential supervision than one headed by a group. It is surely more difficult to fire and replace several people than one. And, if anything, the Bureau’s consolidation of regulatory authority that had been shared among many separate independent agencies allows the President more efficiently to oversee the faithful execution of consumer protection laws. Deci-sional responsibility is clear now that there is one, publicly identifiable face of the CFPB who stands to account—to the President, the Congress, and the people—for all its consumer protection actions. The fact that the Director stands alone atop the agency means he cannot avoid scrutiny through finger-pointing, buck-passing, or sheer anonymity. What is more, in choosing a replacement, the President is unham-. pered by partisan balance or ex-officio requirements; the successor replaces the agency’s leadership wholesale. Nothing about the CFPB stands out to give us pause that it—distinct from other financial regulators or independent agencies more generally—is constitutionally defective. 1. For-Cause Removal Applying the Court’s precedents to this case, we begin by observing that the CFPB Director is,protected by the very same standard, in the very same words— “inefficiency, neglect of duty, or malfeasance in office”—as the Supreme Court sustained in Humphrey’s Executor. Compare 15 U.S.C. § 41, with 12 U.S.C. § 5491(c)(3). Again, the challenged statute imposes no additional layer of particularly onerous protection, per Free Enterprise Fund,.nor indeed any other restriction on removal. And Congress has not given itself authority to participate in the President’s removal decision, which was fatal to the removal mechanisms in Myers and Bowsher. The CFPB’s for-cause protection is therefore unlike any removal restriction that the Court has ever invalidated as impermissibly restricting executive authority. In every case reviewing a congressional decision to afford an agency ordinary for-cause protection, the Court has sustained Congress’s decision, reflecting the settled role that independent agencies have historically played in our government’s structure. See Morrison, 487 U.S. at 688, 108 S.Ct. 2597; Wiener, 357 U.S. at 356, 78 S.Ct. 1275; Humphrey’s Executor, 295 U.S. at 629-30, 55 S.Ct. 869; see also Free Enterprise Fund, 561 U.S. at 509, 130 S.Ct. 3138 (leaving in place “a single level of good-cause tenure” for SEC Commissioners); id. at.510 (suggesting that Congress might ehoose to make PCAOB members removable directly by the President “for good cause”). In analyzing where Congress may deploy such for-cause protection, the Supreme Court looks to “the character of the office” and the “proper functioning of the agency or official.” Morrison, 487 U.S. at 687, 691 n.30, 108 S.Ct. 2697; see Wiener, 357 U.S. at 353, 78 S.Ct. 1275 (emphasizing the “nature of the function” of the agency); Humphrey’s Executor, 295 U.S. at 631, 55 S.Ct. 869 (pointing to the “character of the office”). As seen through that léns, the CFPB’s function is remarkably similar to that of the FTC, a consumer protection agency that has operated for more than a century with the identical for-cause protection, approved by a unanimous Supreme Court. Compare 12 U.S.C. §§ 5511-12, 5532, 5534, 5562-64, with Federal Trade Commission Act of 1914, 15 U.S.C. §§ 45-46; see Free Enterprise Fund, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706; Humphrey’s Executor, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611. Indeed, the independence of financial regulators—chronicled above, see supra Part I.B—is so well established by tradition and precedent that courts have assumed these agencies’ heads have removal protection even in the absence of clear statutory text So directing. See Free Enterprise Fund, 561 U.S. at 487, 130 S.Ct. 3138 (treating SEC Commissioners as removable only for cause). It has long been “generally accepted that the President may remove ' a[n SEC] commissioner [only] for inefficiency, neglect of duty, or malfeasance in office.” SEC v. Bilzerian, 750 F.Supp. 14, 16 (D.D.C. 1990) (citing SEC v. Blinder, Robinson & Co., Inc., 855 F.2d 677, 681 (10th Cir. 1988), and H. Rep. No. 2070, 86th Cong., 2d Sess. 14 (I960)). And in Swan v. Clinton, for example, this court assumed that board members of the National Credit Union Association have removal protection because “people will likely have greater confidence in financial institutions if they believe that the regulation of these institutions is immune from political influence.” 100 F.3d 973, 983 (D.C. Cir. 1996). PHH’s attempt to single out the CFPB from other financial regulators, including the FTC, is unpersuasive. PHH asserts that, when the Court decided Humphrey’s Executor, the FTC “had no substantive rulemaking powers” and “could not order ‘retrospective’ remedies.” Pet’rs’ Reply Br. 6. But the FTC at that time did have broad powers to interpret and enforce the law. See generally, e.g., Federal Trade Comm’n v. Western Meat Co., 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405 (1926). Moreover, many independent agencies (including the FTC) now exercise rulemaking and remedial powers like those of the CFPB. See Nat’l Petroleum Refiners Ass’n v. FTC, 482 F.2d 672, 698 (D.C. Cir. 1973) (holding that the Federal Trade Commission Act conferred substantive rulemaking powers); Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 205(a), 88 Stat. 2183, 2200-01 (1975) (codified as amended at 15 U.S.C. § 45(m)(l)(A)) (authorizing FTC to “commence a civil action to recover a civil penalty in a district court of the United States”). Apart from the panel of this court whose decision we vacated, courts have uniformly understood Humphrey’s Executor to support the constitutionality of for-cause removal protection for the current FTC and certain other agencies with rule-making and enforcement powers. See Morrison, 487 U.S. at 692 & n.31, 108 S.Ct. 2597 (noting that the FTC and other independent agencies “exercise civil enforcement powers”). Well before the Supreme Court in Free Enterprise Fund assumed the unchallenged constitutionality of SEC Commissioners’ for-cause protection, for instance, the Tenth Circuit sustained it, observing that Humphrey’s Executor “stands generally for the proposition that Congress may, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President’s removal power was restricted.” Blinder, Robinson, & Co., 855 F.2d at 682. And, in EEC v. NRA Political Victory Fund, this court noted that Humphrey’s Executor and Morrison confirmed the constitutionality of the Federal Election Commission, which is “patterned on the classic independent regulatory agency” and can both make rules and order retrospective remedies. 6 F.3d 821, 826 (D.C. Cir. 1993); see also 52 U.S.C. §§ 30107(a)(8), 30109 (setting out the FEC’s enforcement power). PHH asks us to cast aside the CFPB’s pedigree in Supreme Court precedent upholding this very type of independence and its lineage in historical practice regarding financial regulators. PHH focuses instead on dicta in Myers that speak of executive removal power as seemingly “illimitable.” Humphrey’s Executor, 295 U.S. at 627-28, 55 S.Ct. 869. Within less than a decade, however, the Supreme Court unanimously rejected that dicta in Humphrey’s Executor, 295 U.S. at 628-29, 55 S.Ct. 869, and unanimously did so again in Wiener, 357 U.S. at 351-52, 78 S.Ct. 1275. In the ensuing decades, while it has cited Myers’s unexceptional holding prohibiting congressional involvement in removal of executive officials, the Court has continued to disavow the broad dicta on which PHH principally relies. See, e.g., Morrison, 487 U.S. at 686-87, 108 S.Ct. 2597; see also Bowsher, 478 U.S. at 724-25, 106 S.Ct. 3181; Free Enterprise Fund, 561 U.S. at 483, 493, 502, 130 S.Ct. 3138. Law and history put the CFPB, led by a Director shielded from removal without cause, on safe ground. 2. . Budgetary Independence Congress’s commitment to independence for financial regulators is also reflected in the ^ CFPB’s budgetary set-up. PHH and some of its amici protest Congress’s choice to allow the CFPB to claim funds from the Federal Reserve rather than through the congressional appropriations process. See Pet’rs’ Br. 26-28; Amicus Br. of Chamber of Commerce 8-9.’ But Congress can, consistent with the Appropriations Clause, create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process. See Am. Fed’n of Gov’t Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth., 388 F.3d 405, 409 (3d Cir. 2004). Using that authority, Congress has consistently exempted financial regulators from appropriations: The Federal Reserve, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the National Credit Union Administration, and the Federal Housing. Finance Agency all have complete, uncapped budgetary autonomy. See, e.g., 12 U.S.C. § 243. (Federal Reserve); see also Hogue, Independence of Federal Financial Regulators, at 26-27. The way the CFPB is funded fits within the tradition of independent financial regulators. The Bureau draws a statutorily capped amount from the Federal Reserve, which formerly administered many of the consumer-protection laws now largely under the CFPB’s purview. See Identification of Enforceable Rulés and Orders, 76 Fed. Reg. 43,569-01, 43,570-71 (July 21, 2011). That feature aims to.help.the CFPB to avoid agency capture that Congress believed had beset the agencies that previously administered the CFPB’s statutes, in part because those agencies depended on industry fees. See Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15, 44-45 (2010); Oren. Bar-Gill & Elizabeth Warren, Making Credit Safer, 157 U. Pa. L. Rev. 1, 93 (2008). The CFPB’s independent funding source has no constitutionally salient effect on the President’s power. The Supreme Court has recently dismissed issues including “who controls the agency’s budget requests and funding” as “bureaucratic minutiae”— questions of institutional design outside the ambit of the separation-of-powers inquiry. Free Enterprise Fund, 561 U.S. at 499-500, 130 S.Ct. 3138. The fact that “the director need not ask the President for help negotiating appropriations from Congress,” Pet’rs’ Br. 27, is neither distinctive nor impermissible. Just as financial regulators ordinarily are independent of the congressional appropriations process, so, too, they typically are exempt from presidential budgetary oversight. See, e.g., 12 U.S.C. § 250. That ensures the measure of permissible independence instituted by for-cause protection is not effectively eroded by virtue of budgetary dependence on the President. The requirement that the CFPB seek congressional approval for funding beyond the statutory cap makes it more constrained in this regard than other financial regulators. PHH suggests that, even if budgetary independence and for-cause removal protection are not separately unconstitutional, their combination might be. See Pet’rs’ Br. 28 (citing Ass’n of Am. R.Rs. v. U.S. Dep’t of Transp., 721 F.3d 666, 673 (D.C. Cir. 2013), vacated on other grounds, — U.S. —, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015)). But that combination is not novel. See, e.g., 12 U.S.C. § 243 (Federal Reserve’s budgetary independence); id. § 242 (Federal Reserve’s for-cause removal protection); id. § 16 (Office of the Comptroller of the Currency’s budgetary independence); id. § 2 (Office of the Comptroller of the Currency’s removal protection). And, in any event, for two unproblematic structural features to become problematic in combination, they would have to affect the same constitutional concern and amplify each other in a constitutionally relevant way. Thus, as we have noted, “Free Enterprise Fund deemed invalid a regime blending two limitations on the President’s removal power.” Ass’n of Am. R.Rs., 721 F.3d at 673. No similar amplification is present here. The CFPB’s budgetary independence primarily affects Congress, which has the power of the purse; it does not intensify any effect on the President of the removal constraint. The CFPB thus fits comfortably within precedent and tradition supporting the independence of the financial regulators that safeguard the economy. Whether it is considered alone or in combination with the independent funding provision, the requirement that the CFPB Director be removed only for cause does not unconstitutionally constrain the President. 3. Multi-Member vs. Single-Director We are nevertheless urged that the constitutionality of for-cause removal turns on a single feature of the agency’s design: whether it is led by an individual or a group. But this line of attack finds no home in constitutional law. To begin with, that contention flies in the face of Morrison, which, contrary to PHH’s suggestions, remains valid and binding precedent. Morrison upheld the constitutionality of for-cause removal protection for an individual agency head who exercised substantial executive authority. The fact that the independent counsel was a solo actor played no role in either the Court’s decision for an eight-member majority or Justice Scalia’s dissent; neither saw that fact as a ground of distinction from the multi-member agencies sustained in Humphrey’s Executor and Wiener.[2] PHH’s emphasis on the CFPB’s leadership by a Director rather than a board defies historical practice as well. The Comptroller of the Currency, for example—an independent federal financial regulator with statutory removal protection dating back 150 years—is also headed by a single director, insulated from removal. See 12 U.S.C. § 2. Other historical examples of sole-headed independent agencies similarly counter PHH’s claim. See supra Part I.B; H.R. Conf. Rep. No. 103-670, at 89-90 (1994) (explaining that sole administrator of Social Security Administration would enhance “management efficiency” and reduce “inappropriate influence”). Historical practice of independent agencies, including the earliest examples of independent financial regulators which operated under single heads, suffices to place the CFPB on solid footing. Fundamentally, Congress’s choice— whether an agency should be led by an individual or a group—is not constitutionally scripted and has not played any role in the Court’s removal-power doctrine. As discussed above, the cases focus on “whether the removal restrictions are of such a nature that they impede the President’s ability to perform his constitutional duty,” Morrison, 487 U.S. at 691, 108 S.Ct. 2597, or, put otherwise, whether the President’s “ability to execute the laws—by holding his subordinates accountable for their conduct—is impaired,” Free Enterprise Fund, 561 U.S. at 496, 130 S.Ct. 3138. Preserving lines of accountability within the executive branch ensures that the public can “determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.” The Federalist No. 70, at 476 (Alexander Hamilton) (J. Cooke ed. 1961). On this measure, the constitutionality of the CFPB’s structure is unaffected by the fact that it is led by a single Director. As a practical matter, considering the impact on presidential power, the line of accountability at the CFPB is at least as clear to the observing public as at multi-headed independent agencies, and the President’s control over the CFPB Director is at least as direct. PHH has not identified any reason to think that a single-director independent agency is any less responsive than one led by multiple commissioners or board members. If anything, the President’s for-cause removal prerogative may allow more efficient control over a solo head than a multi-member directorate. Consider the case of Humphrey’s Executor. There, - President Roosevelt attempted to remove an FTC Commissioner based on policy disagreements. Of. course, the Supreme Court put a stop to the President’s effort to sway the agency, upholding the- Commissioner’s removal protection. 295 U.S. at 625-26, 55 S.Ct. 869. But had the Court not so held, perhaps that would not have been the last of the personnel changes at the FTC. Removal of just one Commissioner by the President might not have had any substantial effect on the multi-member body’s direction, which he so strongly disfavored., The President might have had to remove multiple Commissioners in order to change the agency’s course. By contrast, the CFPB Director’s line of accountability to the President is clear and direct. Before Congress established the Bureau, multiple agencies—most of them independent—had jurisdiction over consumer financial protection, and that dispersion hampered executive ability to diagnose and respond to problems: The creation of the CFPB, with the centralization of previously scattered powers under common leadership, enhanced public accountability and simplified the President’s ability to communicate policy preferences and detect failings. Now, if the President finds consumer protection enforcement to be lacking or unlawful, he knows exactly where to turn. If the offending conduct is rooted in the Director’s failure to carry out the prescribed work of the agency, the President can remove the Director' for “inefficiency, neglect Of duty, or malfeasance in office.” 12 U.S.C. § 5491(c). The President need only remove and replace a single officer in order to transform the entire CFPB and the execution of the consumer protection laws it enforces. Thus, just as the Framers “consciously decid[ed] to vest Executive authority in one person rather than several” so as to “focus, rather than to spread” responsibility and thereby “fa-cilitat[e] accountability” to the people, Clinton v. Jones, 520 U.S. 681, 712, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (Breyer, J., concurring), Congress’s creation of an independent agency led by a single Director would appear to facilitate the agency’s accountability to the President. Eschewing the relevant doctrinal inquiry—whether an agency’s independence im-permissibly ' interferes with presidential power—PHH nonetheless seeks some other home in the precedent for its argument that a single-headed independent agency is unlawful. PHH places great stock in the Court’s observation in Humphrey’s Executor that the FTC is “called upon to exercise the trained judgment of a body of experts.” Petrs’ Br. 22-23 (quoting Humphrey’s Executor, 295 U.S. at 624, 55 S.Ct. 869). It claims an absence of any such body here. Iii reality, Congress created a multi-member body of experts to check the CFPB Director: the Financial Stability Oversight Council (FSOC). See 12 U.S.C. § 5321. The Council brings together the nation’s leading financial regulators, including the Secretary of the Treasury and the Chairman of the Federal Reserve, to constrain risk in the financial system. Id. § 5321(b). The FSOC may stay or veto any CFPB regulation that threatens the “safety and soundness” of the national economy. Id. § 5513. As a, legal matter, the passing reference to a “body” of experts in Humphrey’s Executor arose in the course of the Court’s statutory holding, not its constitutional analysis. Before reaching the constitutional question—whether FTC Commissioners may be given for-cause protection consistently with the separation of powers—the Court needed to discern whether the statute in question actually required for-cause removal. To do so, the Court asked whether the express statutory term allowing removal “by the President for inefficiency, neglect, of duty, or malfeasance in office” carried a negative implication barring the President from removing Commissioners for other reasons or for no reason at all. 295 U.S. at 619, 55 S.Ct. 869. The Court reasoned that the FTC’s composition as a “body of experts” “made clear” that “the intention of Congress” was to limit removal to the enumerated causes. Id. at 623-24, 55 S.Ct. 869. Independence from presidential control, Congress believed, would facilitate the Commission’s access to apolitical expertise and its exercise of neutral judgment. Even as to the statutory question, the Court emphasized the Commissioners’ expertise more than their number: “The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law.” Id. at 624, 55 S.Ct. 869. PHH further suggests that the terms “quasi-legislative” and “quasi-judicial” in Humphrey’s Executor implicitly emphasize collective leadership, because legislatures and appellate courts have more than one member. Oral Arg. Tr. at 40-42. But those terms refer to the functions and powers of the agency, not its singular or plural head. See Humphrey’s Executor, 295 U.S. at 629, 55 S.Ct. 869, The fact that district judges sit alone, for example, makes them no less judicial. As an alternative theory why an agency’s leadership structure-might be constitutionally relevant to presidential power, PHH points out that the CFPB Director’s five-year term means that some future President might not get to appoint a CFPB Director, whereas Presidents typically-have an opportunity to appoint at least some members of multi-member commissions, or to select a member to act as chair. Pet’rs’ Br. 25. But the constitutionality of for-cause protection-does not turn on whether the term is.five years or four. None of the leaders of independent financial-regulatory agencies serves- a term that perfectly coincides with that of the President, and many have longer terms than the CFPB Director., See Hogue, Independence of Federal Financial Regulators, at 14 (“Five-year terms are the most common ... but- some positions have longer terms.”); Marshall J.. Breger &. Gary J. Edles, Established by Practice: The Theory and Operation of Independent Federal Agencies, 52 Admin. L. Rev. 1111, 1137 (2000) (describing terms as “typically extend[ing] beyond the four-year presidential term”). As noted, .the seven governors of the Federal Reserve Board are appointed -to serve staggered fourteen-year terms unless removed for cause. See 12 U.S.C. § 242. Further examples abound. The members of the Consumer Product Safety Commission, the FTC, and the Merit Systems Protection Board have seven-year terms, 15 U.S.C. § 2053; .15 U.S.C. § 41; .5 U.SjC. § 1202, the Federal Deposit Insurance Corporation’s five directors each has. a six-year term, 12 U.S.C. § 1812, so, too, do the National Credit Union Administration’s three members, 12 U.S.C. §§ 1752a(b), (c); and the National Transportation Safety Board’s members serve five-year terms, 49 U.S.C. § 1111. The Social Security Commissioner appointed by President George W. Bush to a six-year term served into the second term of President Barack Obama. ■Across independent agencies, there is also wide variation as to the means, of appointment and térm of various chairpersons. The members of the Federal Election Commission, for instance, serve six-year terms, and the Chair, rather than being presidentially appointed, rotates among the members annually. 52 U.S.C. §§ 30106(a)(2), (5). The International Trade Commission’s Chair, which changes biannually, must alternate between political parties without regard to who is in the White House. 19 U.S.C. § 1330. And among agencies with chairs chosen by the President, not all may be replaced by the President for any reason at any time. The Chair of the Federal Reserve serves a fixed four-year term, and the Federal Deposit Insurance Corporation’s Chair serves a five-year term. 12 U.S.C. § 242; id. § 1812(b)(1). We are not aware of any court that has viewed the existence, strength, or particular term of agency chairs or members to be relevant to the constitutionality of an independent agency. The Constitution has never been read to guarantee that every President will be able to appoint all, or even a majority of, the leaders of every independent agency, or to name its chair. And what practical effect the terms of any particular agency’s members or chair might have on a President’s agenda remains context-dependent and unclear. See Hogue, Independence of Federal Financial Regulators, at 8-9 & n.36 (explaining that the statutory or practical authority of such chairs varies widely); Senate Committee on Governmental Affairs, Study on Federal Regulation, S. Doc. No. 95-91, vol.5, at 35 (1977) (“[T]he President would have only a limited opportunity to affect the leadership of any given commission; most of the time, hold-overs from a prior administration could be expected to be part of the membership.”). PHH assumes that this factor always cuts one way. In reality, the diversity of circumstance helps illustrate why PHH errs in treating commission structure as constitutionally decisive. Notably, when the President does get to replace the CFPB Director, he is not restricted by ex-officio requirements to appoint incumbent officeholders, or by a partisan-balance mandate to select individuals who do not even belong to his political party. See, e.g., 15 U.S.C. § 78d(a) (not more than three of five SEC Commissioners shall be members of the same political party); 12 U.S.C. § 1812(a)(2) (not more than three of the five members of the FDIC’s Board of Directors may be members of the same political party, and one must have State bank supervisory experience); 12 U.S.C. § 242 (the Chairman and two Vice Chairmen of the Federal Reserve are designated from among its Board of Governors). At bottom, the ability to remove a Director when cause to do so arises and to appoint a replacement provides “ample authority to assure that the [Director] is competently performing his or her statutory responsibilities.” Morrison, 487 U.S. at 692, 108 S.Ct. 2597. After all, the terms “inefficiency, neglect of duty, or malfeasance in office” are “very broad.” Bowsher, 478 U.S. at 729, 106 S.Ct. 3181. Given these realities, a single level of for-cause protection for heads of certain appropriate agencies is constitutionally permissible despite the possibility that some future President will lack a regularly occurring vacancy to fill. We find no reason in constitutional precedent, history, or principle to invalidate the CFPB’s independence. The Supreme Court has sustained for-cause protection for the heads of certain administrative agencies—even if they perform a mix of regulatory, investigative, prosecutorial, and adjudicatory functions—as compatible with the President’s essential duty to assure faithful execution of the law. The CFPB led by a single Director is as consistent with the President’s constitutional authority as it would be if it were led by a group. Like other independent federal financial regulators designed to-protect the public interest in the integrity and stability of markets from short-term political or special interests, the CFPB is without constitutional defect. II. Broader Theories of Unconstitutionality PHH goes further than trying to proble-matize the CFPB’s leadership structure with reference to the logic or language of the Supreme Court’s removal-power cases; it offers several broader theories of unconstitutionality. None of PHH’s novel objections to the Director’s for-cause protection squares with the Constitution or precedent. And PHH’s disputed factual premises about the effects of agency design choices underscore that, while such considerations may be useful fodder for policy-making by Congress, they are not grounds for courts to reshape the constitutional removal power. First, breaking with traditional separation-of-powers analysis and precedent, PHH and its amici assail the CFPB as somehow too powerful. See Pet’rs’ Br. 24; Amicus Br. of Chamber of Commerce 8-11. But nothing about the focus or scope of the agency’s mandate renders it constitutionally questionable; indeed, the Bureau’s powers have long been housed in and enforced by agency officials protected from removal without cause. That fact underscores our fundamental point: The exercise of those powers by an independent official does not interfere with the President’s constitutional role. Second, the CFPB’s sole directorship is not historically anomalous. And, in any event, congressional innovation in the CFPB’s internal structure would not alone render the agency constitutionally invalid. Third, PHH’s notion that a multi-mem-ber structure would safeguard liberty, writ large, because it would cheek or slow or stop the CFPB from carrying out its duties is a non-sequitur from the perspective of precedent, which focuses on President’s authority and the separation of powers. Finally, our decision to sustain the challenged for-cause provision cannot reasonably be taken to invite Congress to make all federal agencies, (or various combinations thereof) independent of the Presi-' dent. The President’s plenary authority over his cabinet and most executive agencies is obvious and remains untouched by our decision. It is PHH’s unmoored theory of liberty that threatens to lead down a dangerously slippery slope. A. Scope of Agency Power PHH argues that, because the CFPB Director wields “vast authority” over the American economy, he cannot be protected from the President. Pet’rs’ Br. 28. Both the factual and the legal premises of that argument are unsupported. To begin with the factual assertion, the CFPB’s power and influence are not out of the ordinary for a financial regulator or, indeed, any type of independent administrative agency. The Bureau enforces anti-fraud rules in the consumer finance context; it does not unilaterally exercise broad regulatory power over the financial system. Its authority reaches only entities providing “consumer financial product[s] or service[s],” limited to those offered to individual consumers “primarily for personal, family, or household purposes.” See 12 U.S.C. § 5491(a); id. §§ 5481(4), (5), (6), (15). It does not address, for example, business-to-business or institutional debt or investments. In that respect, it contrasts with the 1935-era FTC—upheld by the Court in Humphrey’s Executor, 295 U.S. at 620, 55 S.Ct. 869—that had authority; with limited exceptions, over commerce generally. That the CFPB is headed by a single Director does not render the scope of its responsibilities anomalous or problematic. Independence has long been associated with financial regulators .with wide latitude. to oversee and steady financial markets and the national economy. See supra Part I.B. Independent financial regulators have been headed either by one person, as with the Comptroller of the Treasury and the Comptroller of the Currency, or by a group, as with the Federal Reserve. The CFPB’s authority to ensure the fairness of family- and household-facing financial products does not somehow pose unprecedented dangers rendering every historical analogue inapt. As for PHH’s legal premise that the scope of the CFPB’s regulatory authority is constitutionally relevant, Humphrey’s Executor turned not on the breadth of the FTC’s jurisdiction or on its social and economic impact, but on its character as a financial and commercial regulator. The Supreme Court described the FTC as “an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid.” Humphrey’s Executor, 295 U.S. at 628, 55 S.Ct. 869. PHH relies on Morrison’s description of the independent counsel as having only “limited jurisdiction and tenure and lacking policymaking or significant administrative authority.” 487 U.S. at 691, 108 S.Ct. 2597. Those limitations were significant in Morrison because the independent counsel’s criminal-law-enforcement functions were quintessentially “executive” in nature; the Court placed emphasis on features of ■ the independent counsel that would clearly distinguish her from, for example, an independent Attorney General. See id. The Court spelled out the independent counsel’s functions to make plain that they were not “so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.” Id. at 691-92, 108 S.Ct. 2597. But that is not to suggest-that it is appropriate to tally up the number of laws an agency is charged with administering in order to determine whether it may be independent. Cf. Pet’rs’ Reply Br. 2. Indeed, the independent counsel had all of federal criminal law at her disposal. Rather, the Court has analyzed the function of the office in question and where it stood in relation to particular types of governmental power, including those like criminal prosecution that are indisputably and .solely executive. In sum, under the requisite functional analysis, the CFPB’s authority is more cabined than either the FTC’s or the independent counsel’s, and the agency is part of a longstanding tradition, dating back to the founding of the Republic, of financial regulators with a modicum of independence from presidential will. B. Novelty PHH further argues that the CFPB’s structure "is constitutionally suspect because it is novel. We reject both premise's—that whatever novelty the CFPB may represent calls into question its constitutionality, and that the CFPB is in any relevant respect unprecedented. Even if the CFPB were anomalous, PHH points to nothing that makes novelty itself a source of unconstitutionality. Novelty “is not necessarily fatal; there is a first time for everything.” Nat’l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. 519, 549, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (opinion of Roberts, C.J.); see also Mistretta v. United States, 488 U.S. 361, 385, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (addressing the constitutionality of the Sentencing Commission and noting that “[o]ur constitutional principles of separated powers are not violated ... by mere anomaly or innovation”). The independent counsel, the Sentencing Commission, and the FTC were each “novel” when initiated, but all are constitutional. In the precedents PHH invokes, novelty alone was insufficient to establish a constitutional defect. For instance, in NLRB v. Noel Canning, the Supreme Court interpreted the President’s express constitutional authorization to “fill up all Vacancies that may happen during the Recess of the Senate.” — U.S. —, 134 S.Ct. 2550, 2556, 189 L.Ed.2d 538 (2014); see U.S. Const. art. II, § 2, cl. 3. An historical practice of recess appointments “since the beginning of the Republic” aided in “expounding terms [and] phrases”—“Recess of the Senate” and “Vacancies that may happen”—and the Court treated “practice as an important interpretive factor.” 134 S.Ct. at 2560 (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 The Writings of James Madison 450 (Hunt ed., 1908)). But novelty did not create the constitutional question or define the constitutional violation. In Free Enterprise Fund, the Supreme Court quoted a dissenter in this court stating that “lack of historical precedent” for dual-layered protection may be “the most telling indication of [a] severe constitutional problem.” 561 U.S. at 505, 130 S.Ct. 3138 (quoting Free Enterprise Fund v. Public Co. Accounting Oversight Bd., 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)). But it did so only after explaining how, under its own precedent, the unusual set-up of the Public Company Accounting Oversight Board directly impaired the President’s “ability to execute the laws.” 561 U.S. at 500-01, 130 S.Ct. 3138. Other constitutional principles beyond novelty must establish why a specific regime is problematic. ' A constrained role for novelty in constitutional doctrine is well justified. Our political representatives sometimes confront new problems calling for tailored solutions. The 2008 ‘financial crisis, which Congress partially attributed to a colossal failure of consumer protection, was surely such a situation. The Constitution was “intended to endure, for ages to come, and, consequently, to be adapted to the various crises of human affairs.” McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819). The judiciary patrols constitutional boundaries, but it does not use the Constitution merely to enforce old ways. Even if we agreed that the CFPB’s structure were novel, we would not find it unconstitutional on that basis alone. As for the descriptive premise of the novelty argument—that the- CFPB’s sole-director structure makes it historically exceptional, Pet’rs’ ■ Br. 23—we again must disagree. For starters, there is no appreciable difference between the historical pedigree of single-member and multi-member independent agencies. The most notable early examples in either category (and the only pre-Twentieth Century ones) are sole-headed financial regulators: the Comptroller of the Treasury, dating back to the late-Eighteenth Century; and the Office of the Comptroller of the Currency, established in the mid-Nineteenth. See Act of Sept. 2, 1789, ch. 12, § 3, 1 Stat. at 66; Nat’l Bank Act of 1863, 12 Stat. at 665-66. Other examples of single-headed independent agencies include the Social Security Administration, which was placed under a single director in 1994, see 42 U.S.C. § 902(a), and the Office of Special Counsel established under a sole director in 1978, the same year as the Office of Independent Counsel upheld in Morrison, see 5 U.S.C. § 1211; Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978). Congress established the sole-headed, for-cause-protected Federal Housing Finance Agency in 2008, in response to similar concerns as gave rise to the CFPB. See 12 U.S.C. § 4512. This longstanding tradition provides historical pedigree to the CFPB, and refutes the contention that the CFPB’s single-director structure is anything new. See supra Parts I.B., I.C.3. PHH and its amici try to undermine these analogues by asserting that Presidents have consistently objected to single-headed independent agencies. See Amicus Br. of United States 17-19. As an initial matter, no contemporaneous objection was voiced by the President or any dissenting faction within Congress to placing the CFPB itself under a Director rather than a board. PHH’s contention is further belied by history. President Lincoln, for instance, signed without objection an act rendering the Comptroller of the Currency removable only with advice and consent of the Senate. Steven G. Calabresi & Christopher S. Yoo, The Unitary Executive During the Second Half-Century, 26 Harv. J.L. & Pub. Pol’y 667, 734 (2003); George Wharton Pepper, Family Quarrels: The President, The Senate, The House 111 (1931); see Nat’l Bank Act of 1863,12 Stat. 665, 665-66 (1863). And President George H.W. Bush approved that Congress had decided to “retain[ ] current law which provides that the Special Counsel may only be removed for inefficiency, neglect of duty, or malfeasance.” George H.W. Bush, Remarks on Signing the Whistleblower Protection Act of 1989 (Apr. 10, 1989), http://www.presidency.ucsb.eduAvs/?pid= 16899. Evidence proffered to show presidential contestation is recent, sparse, and nonspecific. See Amicus Br. of United States 17-19. Executive objections to removal restrictions have not made clear whether they opposed protecting a sole agency head in particular, or for-cause protections more generally. See Statement by President William J. Clinton Upon Signing H.R. 4277, 1994 U.S.C.C.A.N. 1624 (Aug. 15, 1994) (Clinton administration objection to Social Security Administration under a sole, independent administrator on the ground that “the provision that the President can remove the single Commissioner only for neglect of duty or malfeasance in office raises a significant constitutional question”); Mem. Op. for the Gen. Counsel, Civil Serv. Comm’n, 2 Op. O.L.C. 120, 120 (1978) (Carter administration objection to creation of Office of Special Counsel because it exercised “functions [that] are executive in character,” such as investigation and prosecution); President Ronald Reagan, Mem. of Disapproval on a Bill Concerning Whistleblower Protection, 2 Pub. Papers 1391, 1392 (Oct. 26, 1988) (Reagan administration objection to law creating Office of Special Counsel because it “purports to insulate the Office from presidential supervision and to limit the power of the President to remove his subordinates from office”). The scant and ambivalent record of executive-branch contestation thus does not detract from the tradition of sole-headed agencies as precedents for the CFPB. We are also unpersuaded by efforts to distinguish away agencies like the Social Security Administration and the Office of Special Counsel on the ground that they lack authority to bring law enforcement actions against private citizens. See Amicus Br. of United States 17-18. Those agencies perform important and far-reaching functions that are ordinarily characterized as executive. The Social Security Administration runs one of the largest programs in the federal government, overseeing retirement, disability, and survivors’ benefits, handling millions of claims and trillions of dollars. And the Office of Special Counsel enforces workplace rules for federal government employers and employees. Casting these agencies as somehow less important than the CFPB does not show them to be less “executive” in nature. The CFPB’s single Director is not an historical anomaly- C. Freestanding Liberty Moving beyond precedent and practice, PHH and its amici ask us to compare single-headed and group-led agencies’ relative contributions to “liberty.” The CFPB, headed by an individual Director, is constitutionally invalid, they say, because it diminishes the President’s firing authority without substituting a different, ostensibly liberty-protecting mechanism—collective leadership. See, e.g., Pet’rs’ Br. 2. If a majority of an agency’s leadership group must agree before the agency can take any action, the agency might be slower and more prone to compromise or inaction. A sole-headed agency, by contrast, might be nimble and resolute. Because multiple heads might make the CFPB less likely to act against the financial services industry it regulates, group leadership is, according to PHH, constitutionally compelled. There is no question that “structural protections against abuse of power [a]re critical to preserving liberty.” Bowsher, 478 U.S. at 730, 106 S.Ct. 3181; see also Free Enterprise Fund, 561 U.S. at 501, 130 S.Ct. 3138 (quoting Bowsher, 478 U.S. at 730, 106 S.Ct. 3181). Agencies’ accountability to the President and the people, bolstered by the removal power, can ultimately protect liberty. But by arguing that sole-headed and group-headed agencies differ in terms of “liberty” without identifying any differential effect on accountability, PHH proposes a ground for our decision that lacks doctrinal footing and conflicts with Morrison’s approval of a sole-headed independent agency. Morrison, Wiener, and Humphrey’s Executor hold that unbridled removal power in the President’s hands is not a universal requirement for constitutional accountability; those cases thus underscore that such unbridled power is not in all contexts necessary to serve liberty or the myriad other constitutional values that undergird the separation of powers. Broad observations about liberty-enhancing effects are not themselves freestanding constitutional limitations. PHH’s brand of argument depends on a series of unsupported leaps. First, it treats a broad purpose of the separation of powers—safeguarding liberty—as if it were a judicially manageable constitutional standard. But, as criteria for judicial decision, the purposes of the separation of powers are too general and diverse to offer much concrete guidance. Among other things, the separation of powers and the accompanying checks and balances promote efficiency, energy, stability, limited government, control of factions, deliberation, the rule of law, and accountability. ... [I]n the absence of any specific textual home or pattern of historical practice or judicial precedent, one could reasonably move from these broad and often-conflicting purposes to any number of fair conclusions about ... almost any freestanding separation of powers question. John F. Manning, Foreword: The Means of Constitutional Power, 128 Harv. L. Rev. 1, 56-57 (2014). As sustained by the Supreme Court, for-cause removal restrictions presumptively respect all of the “general and diverse” goals of separation of powers, see id. at 56, including liberty. Once the Supreme Court is satisfied that a removal restriction leaves the President adequate control of the executive branch’s functions, the Court does not separately attempt to re-measure the provision’s potential effect on liberty or any other separation-of-powers objective. • Another of PHH’s leaps is its assumption that the CFPB’s challenged characteristics diminish “liberty,” writ large. It remains unéxplained why we would assess the challenged removal restriction with reference to the-liberty of financial services providers, and not more broadly to the liberty of the individuals and families who are their customers. Congress determined that, without the Dodd-Frank Act and-the CFPB, the activities the CFPB is how empowered to regulate contributed to the 2008 economic crisis and Americans’ devastating losses of property and livelihood. Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report, at xv-xvii. Congress understood that markets’ contribution to human liberty derives from freedom of contract, .and that such freedom depends on market participants’ access to accurate information, and on clear and reliably enforced rules against fraud and coercion. Congress designed the CFPB with those realities in mind. More fundamentally, PHH’s unmoored liberty analysis is no part of the inquiry the Supreme Court’s cases require: As Part I explains, the key' question in the Court’s removal-power cases is whether a challenged restriction either aggrandizes the power of another branch or impermis-sibly interferes with the duty and authority of the President to execute the laws. The CFPB Director’s for-cause restriction does neither. That result is liberty-protecting; it respects Congress’s chosen means to cleanse consumer financial markets of deception and fraud, and respects the President’s authority under the challenged law to ensure that the CFPB Director performs his or her job competently and in accordance with the law. The traditional for-cause protection leaves the President “ample authority” to supervise the agency. Morrison, 487 U.S. at 692, 108 S.Ct. 2597. If the CFPB Director runs afoul of statutory or constitutional limits, it is the President’s prerogative to consider whether any excesses amount to cause for removal, the Financial Stability Oversight Council’s expert judgment whether to step in to protect markets, and the courts’ role to them in violations of individual rights. The now-reinstated panel holding that invalidated the disgorgement penalties levied against PHH (a holding expressly approved by three additional members of the en banc court, see Concurring Op. (Tatel, J.)), illustrates how courts appropriately guard the liberty of regulated parties when agencies overstep. The fact that the CFPB is led by one Director, rather than several commissioners, does not encroach on the President’s constitutional power and duty to supervise the enforcement of the law. D. The Cabinet and the Slippery Slope Finally, PHH mounts a slippery-slope argument against the CFPB. Sustaining the CFPB’s structure as constitutionally permissible, PHH argues, could, threaten the President’s control over the Cabinet. Pet’rs’ Reply Br. 7. We disagree. “[Tjhere .are undoubtedly executive functions that, regardless of the enactments of Congress, must be performed by officers subject to removal at will by the President.” Bowsher, 478 U.S. at 762, 106 S.Ct. 3181 (White, J., dissenting); see Morrison, 487 U.S. at 690, 108 S.Ct. 2597 (same). Should Congress ever seek to provide the Cabinet.with for-cause protection against removal, at least two principled distinctions would differentiate this case from a challenge to such a law. First, - the Supreme Court’s removal-power precedent, which we follow here, makes-the.nature of the agency's function the central consideration in whether Congress may grant it a measure of independence. The Court has held, time and again, that while the Constitution broadly vests executive power in the President, U.S. Const, art. II, § 1,- cl. 1, that does not require that the President have at-will authority to fire every , officer. Doctrine and history squarely place the CFPB Director among those officials who may constitutionally have for-cause protection. At the same time, there are executive officials whom the President must be able to fire at will. See generally Marburg v. Madison, 5 U.S. (1 Cranch) 137, 166, 2 L.Ed. 60 (1803) (“[WJhere the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to aqt in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable.”). Those would surely include Cabinet members— prominently, the Secretaries of Defense and State—who' have open-ended and sweeping portfolios to assist with the President’s core constitutional responsibilities. See generally Myers, 272 U.S. at 141, 47 S.Ct. 21 (suggesting that “ministerial” acts of Secretary of State were “entirely to be distinguished from his duty as a subordinate to the President in the discharge of the President’s political duties which could not be controlled”). Executive functions specifically identified in Article II would be a good place to start in understanding the scope of that executive core." It includes, at least, the President’s role as Commander in Chief, and the foreign-affairs and pardon powers. U.S. Const. art. II, § 2; see Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 211, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (“The President has broad authority in the field of foreign affairs.”). Although this case does not require us to catalogue every official on either side of the constitutional line, we emphasize that certain governmental functions may not be removal-restricted. Second, Cabinet-level officers traditionally are close presidential advisers and allies. Under the 25th Amendment, Cabinet officials have the power (by majority vote and with the Vice President’s assent) to remove the President temporarily from office. See U.S. Const, amend. XXV, § 4; Freytag v. Comm’r of Internal Revenue, 501 U.S. 868, 887, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (suggesting that the 25th - Amendment, which refers to “the principal officers of the executive departments,” refers to “Cabinet-level entities”). We do not believe that the heads of independent agencies are executive-agency principals eligible under the 25th Amendment to vote on a President’s incapacity. Cabinet officials are also, by statute, in the presidential line of succession, see 3 U.S.C. § 19(d)(1), and their agencies are specifically denoted as “Executive departments,” 5 U.S.C. § 101. There is thus little prospect that Congress could require the President to tolerate a Cabinet that is not fully and directly accountable to him. Indeed, the slipperiest slope lies on the other side of the mountain. PHH argues that, regardless of whether .Humphrey’s ■Executor itself turned on the FTC’s multi-member character, we should reject any independent agency that does not precisely mimic the agency structure that the Court approved in that case. See Pet’rs’ Br. 22. PHH gleans from Free Enterprise Fund the proposition that “when a court is asked ‘to consider a new situation not yet encountered by the [Supreme] Court,’ there must be special mitigating ‘circumstances’ to justify ‘restricting the President] in his ability to remove’ an officer.” Pet’rs’ Br. 22 (quoting 561. U.S. at 483-84, 130 ' S.Ct. 3138). The Court held no such thing. And if we were to embrace an analysis invalidating any independent agency that does not mirror the 1935-era FTC, our decision would threaten many, if not all, modern-day independent agencies, perhaps including the FTC itself. See Pet’rs’ Reply Br. 6 (noting that the FTC did not claim rule-making authority until 1962). PHH suggests that so-called “[hjistorical[ ]” multi-member independent agencies are different in kind—and thus would be safe even if the CFPB were invalidated— because “their own internal checks” somehow substitute for a check by the President. Pet’rs’ Br. 23. The argument is that multi-member agency leadership could check or slow or stop agency action even when the President could not, and that such a check, in turn, protects liberty. PHH’s newly devised theory posits that freestanding liberty is the goal, and that various agency design features might be a means—alternative to illimitable presidential control but nonetheless somehow mandated by Article II—to ensure that liberty. That theory lacks grounding in precedent or principle. See supra Part I.C.3. In Free Enterprise Fund, for example, the fact that the PCAOB and the SEC were both multi-member bodies did not salvage the Board’s dual-layered removal limitation. If PHH’s version of liberty were the test—elevating regulated entities’ liberty over those of the rest of the public, and requiring that such liberty be served by agencies designed for maximum deliberation, gradualism, or inaction—it is unclear how such a test could apply to invalidate only the CFPB. That test would seem equally to disapprove other features of many independent agencies. Consider, for example, efficiency-promoting features like a strong chairperson, low quorum requirement, small membership, shared professional or partisan background, and electronic or negative-option voting. Even a multi-member independent agency might have features that offset that body’s theoretical gradualism and, in practice, achieve the efficiency that PHH’s liberty analysis condemns. Would such an agency be susceptible to challenge under PHH’s theory as threatening to liberty? By the same token, it is also unclear why a doctrine embracing PHH’s brand of freestanding liberty analysis would not constitutionally obligate Congress to affirmatively impose additional internal checking mechanisms on all independent agencies. Many familiar processes and structures—such as partisan or sectoral balance, requirements of large and broadly representative membership; high quorum, supermajority or unanimity rules; or even mandatory in-person meetings and votes—might foster deliberation and check action as much if not more than mere multi-member leadership. Reading the Constitution, as PHH does, to require courts to impose group leadership at independent agencies would appear to throw open many other institutional design features to judicial second-guessing. For good reason, PHH’s freestanding liberty analysis is not, and has never been, the law. The reality that independent agencies have many and varied design features underscores that there is no one, constitutionally compelled template. Academic analyses to which PHH and dissenters point for the proposition that a multi-head-ed structure is the sine qua non of these agencies’ constitutional validity, see Dissenting Op. at 177-78 (Kavanaugh, J.), do not support their theory. Those materials are more descriptive than prescriptive. And, contrary to the dissenters’ suggestions, they do not treat multiple membership as indispensable. Rather, scholars identify various indicia of agency independence that demonstrate the rich diversity of institutional design. See Kirti Datla & Richard L. Revesz, Deconstructing Independent Agencies (and Executive Agencies), 98 Cornell L. Rev. 769, 774 (2013) (“Congress can—and does—create agencies with many different combinations of indicia of independence .... ”); Barkow, Insulating Agencies, 89 Tex. L. Rev. at 16-18 (urging a functionalist analysis beyond the “obsessive focus on removal as the touchstone of independence”—and emphasizing the “failure of banking agencies to guard against lending abuses” as a reason for agency independence); Lisa Schultz Bressman & Robert B. Thompson, The Future of Agency Independence, 63 Vand. L. Rev. 599, 607-10 (2010) (describing “[financial agencies ... [as] among the most prominent independent agencies” and independent agencies as having “some variety in design,” with some generally “share[d]” attributes); Breger & Edles, Established by Practice, 52 Admin L. Rev at 1113-14 (“[W]e review the structure and internal operations of independent agencies, not[ing] several similarities and differences among them ....”); id. at 1137-38 (describing many “modern” independent agencies as adopting “the commission form” but describing “the protection ... against removal ‘for cause’ ” as the “critical element of independence”); The President’s Committee on Administrative Management, Report of the Committee with Studies of Administrative Management in the Federal Government 216 (1937) (theorizing that there are “[s]ome regulatory tasks” that, per “popular belief,” “ought to be performed by a group,” while others call for “regional representation”); id. (emphasizing the importance of agency independence to ensure that certain regulatory functions are “kept free from the pressures and influences of political domination”); see also Free Enterprise Fund, 561 U.S. at 547, 130 S.Ct. 3138 (Breyer, J., dissenting) (describing “[a]gency independence [a]s a function of several different factors” and finding the “absence” of one— in the ease of the SEC, an express “for cause” provision—“not fatal to agency independence”). Today’s independent agencies are diverse in structure and function. They have various indicia of independence, including differing combinations of independent litigation and adjudication authority, budgetary independence, autonomy from review by the Office of Management and Budget, and the familiar removal restrictions. See Datla & Revesz, Deconstructing Independent Agencies, 98 Cornell L. Rev. at 772. The particular design choice that PHH here highlights—whether to create a single-director or multi-member agency—implicates policy determinations that we must leave to Congress. There are countless structural options that might be theorized as promoting more or less thorough deliberation within agencies. Our own judgments of contested empirical questions about institutional design are not grounds for deeming such choices constitutionally compelled. After all, “[t]he court should ... not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are ‘best’ or most likely to further some vague, undefined public good”—including “liberty,” however defined. Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Even accepting deliberative virtues of multi-member bodies under certain conditions, other structural choices serve other virtues of equal importance. We should not require Congress always to privilege the putative liberty-enhancing virtues of the multi-member form over other capabilities Congress may choose, such as efficiency, steadiness, or nuanced attention to market developments that also, in different ways, may serve the liberty of the people, That is' why the Supreme Court has acknowledged congressional latitude to fashion agencies in different ways, recognizing that the “versatility of circumstances often mocks a natural desire for definitiveness.” Wiener, 357 U.S. at 352, 78 S.Ct. 1275. Judicial review of agency design choices must focus on ensuring that Congress has not “interfere[dj with the President’s exercise of the ‘executive power’ and his constitutionally appointed duty to ‘take care that the laws be faithfully executed’ under Article II.” Morrison, 487 U.S. at 690, 691 n.30, 108 S.Ct. 2597. Internal agency dynamics to which PHH points have little to do with the President’s ultimate duty to ensure that the laws are faithfully executed. ■A constitutional analysis that condemns the CFPB’s for-cause removal provision provides little assurance against—indeed invites—the judicial abolition of all independent agencies. PHH and dissenters do not dispel that concern. In PHH’s view, the Supreme Court’s entire line of precedent beginning with Humphrey's Executor was wrongly decided. See Pet’rs’ Br. 22 n.4 (preserving argument for overrule of Morrison and Humphery's Executor); see also Dissenting Op, at 194-95 n.18 (Kavanaugh, J.) (noting PHH’s preservation of that argument). PHH’s course calls into question the legitimacy of every independent agency. We instead follow Supreme Court precedent to sustain the challenged Act of Congress. Conclusion Applying binding Supreme Court precedent, we see no constitutional defect in .the statute preventing the President from firing the CFPB Director without cause. We • thus uphold Congress’s choice. The Supreme Court’s removal-power decisions have, for more than eighty years, upheld ordinary for-cause protections of the heads of independent agencies, including financial regulators: That precedent leaves to the legislative process, not the courts, the choice whether to subject the Bureau’s leadership to at-will presidential removal. Congress’s decision to provide the CFPB Director a degree of insulation reflects its permissible judgment that civil regulation of consumer financial protection should be kept one step removed from political winds and presidential will. We have no warrant here to invalidate such a time-tested course. No relevant consideration gives us reason to doubt the constitutionality of the independent CFPB’s single-member structure. Congress made constitutionally permissible institutional design choices for the CFPB with which courts should hesitate to interfere. “While the Constitution diffuses power the better to secure liberty, it also contemplates that practice .will integrate the dispersed powers into a workable government.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The petition for review is granted in part and denied in part, and the case is remanded to the agency for further pro- , ceedings. . Congressional inaction or delayed confirmation would not necessarily extend the period of for-cause protection. Oral Arg. Tr. 48-49. Cf. Swan v. Clinton, 100 F.3d 973, 988 (D.C. Cir. 1996) (“[E]ven if the [National Credit Union Administration] statute were interpreted to grant removal protection to Board members during their appointed terms[,] ... this protection does not extend to holdover members.”). . The independent counsel’s inferior-officer status is not ground for distinguishing Moni-son from this case. The Appointments Clause separately identifies the permissible appointing mechanisms for principal and inferior officers, U.S. Const, art. II, § 2, cl. 2, because of such officers' differing routes of accountability to the President: Principal officers are directly accountable, while inferior officers are indirectly accountable through the principal officer to whom they report. While that distinction is constitutionally relevant to the President’s appointments power, it is not determinative of the removal-power question. That is because the removal inquiry asks not whether an official exercises significant governmental authority, but whether a measure of independence in the exercise of such power interferes with the President’s constitutional duty and prerogative to oversee the executive branch and take care that the laws are faithfully executed. The degree of removal constraint effected by a single layer of for-cause protection is the same whether that protection shields a principal or inferior officer. In either case, the President—or a principal officer acting as the President’s agent—may not fire the independent officer except for cause. Indeed, the objective of the independent counsel statute was to protect the counsel’s independence, not only from the President’s direct interference, but also from interference by the President’s agent, the Attorney General. The question whether a removal restriction unconstitutionally constrains presidential power thus does not track whether the shielded official is a principal or inferior officer. Even the mildest degree of removal protection of certain subordinate officers—such as the Secretary of the Navy or the Chief of Staff to the Secretary of State—could pose a constitutional problem, whereas Supreme Court precedent treats ordinary for-cause protection of some principal officers, such as members of the Federal Trade Commission or the SEC, to be permissible.